v. Sandoval, No. 24-2107. And, Counsel, I see you are ready to go. I am. Thank you, Your Honor. Before I begin, I was hoping that I could reserve three minutes of my time for rebuttal. Well, you will see how that goes, but we'll try. Thank you. I appreciate that. This case involves a charge of 35 felonies against James Sandoval. All arise from his receipt of Social Security disability benefits for his disabling medical conditions, which include end-stage emphysema, though there are others as well. The bulk of this appeal, if only numerically, is sufficiency of the evidence as to the 33 counts of theft of government property in violation of 18 U.S.C. 641. He was specifically charged with stealing SSDI benefits over the 33 months from June of 2017 to February of 2020. In the jury instruction that was given at trial, it's jury instruction No. 11, the very first element is whether those benefits payments belonged to the government. It's an essential element. Mr. Sandoval, if he was entitled to receive those benefits under the SSA regulations, would not have committed theft because they wouldn't belong to the government. Thus far, everyone is in agreement, including the district court's opinion in this case. The regulations create the entitlement to those benefits, and they also take it away. Entitlement is the word that's used in the regulations, including in 20 CFR 404.3.16, which defines when entitlement to disability benefits begins and ends. Those regulations, and specifically 3.16.B.4. and D, raise a preliminary question of whether you have a disabling impairment, and not contested that he does. If so, all these other regulations also attach, and they create a trial work period and a re-entitlement period. All told, this creates years of entitlement for a genuinely disabled person like Mr. Sandoval. At the trial, there was evidence that Mr. Sandoval had significant gainful employment for a significant period of time. Is that right? The evidence at trial was focused on substantial gainful activity. However, for a person who has a disabling impairment like Mr. Sandoval, who also was receiving payments for over 24 months, the standards are different as to what substantial gainful activity means. In this case, with those facts being established, it means a certain threshold of income. But income is defined in a very specific way for a self-employed person like Mr. Sandoval. So it's a numerical threshold that he has to meet, and it requires not a number of hours worked or a number of years worked, but instead what he is making. And that is not only just the gross revenues that he takes in, but also it has to reflect the expenses paid. I didn't see anywhere in your brief where, and we looked, where there was a case that said that the government had to prove net income. Do you have such a case? I don't think that it's a matter of finding a case where the facts are specifically the same, because it's the type of defendant that this is. His entitlement to benefits is different because of his disabling impairment and the length of time that he was receiving benefits. So unless there's another case in which another defendant was situated like that, I wouldn't expect to see the countable income test become as central as it did to this trial. So the answer is no, that you don't have a case where countable income is the deciding factor? No, but I think there are cases, and I think in terms of looking at what the elements of entitlement are, what makes you entitled to these benefits or not, it does hinge on the regulations. And for him in particular, those regulations mean satisfying the countable income test. And there are, I mean, even I think I cited United States v. Anderson, which is not a criminal case, but is a preponderance standard wherein incorporation of an SSA determination in the past is not sufficient to even meet a preponderance standard. On an administrative determination? Right. What about tax evasion cases? It seems like it would apply, it would arise all the time. I don't file a tax return, and the government says, well, Bob, you should have filed a tax return. I say, well, I didn't net enough income. Would there be any reason to differentiate those cases? I'm not sure. I think that under a part of the SSA regulations incorporate the tax code, and that's where the normal business expenses standards come from. So I think that there is a lot of overlap in that kind of analysis as to what it would be that you would owe. So if the government is saying, you owe a certain amount, and here, substantial gainful activity requires a certain amount, then it would have to be proven. Well, what about if it's a criminal case? And the question is the same one that Judge McHugh posed. Well, does the government have the burden to demonstrate that there are these deductions that would cause someone with $1.9 million of gross over five years to not even have $14,000 of net income for purposes of the obligation under criminal law to file a tax return? I think that under Morrissette, you're looking at an element, an essential element of this crime, being the entitlement to benefits or not. In this case and in the tax evasion cases. Right. You're looking at something that is the government's burden to prove beyond a reasonable doubt, because it is the determining factor in whether or not he was entitled to those benefits. Can the government prove by circumstantial evidence? Sure. And I think that is... And so they put on evidence that there was a whole lot of money coming through, that he was pocketing some of the cash instead of putting it into the bank accounts, and testimony from people who did his books about actual amounts that were coming in. At that point, isn't it his job to come in and say, yeah, but I had all these expenses? I think there was some evidence about his expenses. I think ultimately it is the government's burden to prove beyond a reasonable doubt that that threshold was passed. He controlled all that information, didn't he? Every time they asked for information like, what do you pay your suppliers, he said it was a trade secret. Well, in his bank records, which they did obtain pursuant to subpoena, a lot of that information already exists. And they did talk to several of those suppliers, and there were some testimony from them at trial as to some extremely high costs for some of these materials. Why isn't it probative circumstantial evidence that he transferred funds from the business accounts to his personal account, and in addition to that, that he transferred funds from the business accounts to his mother's accounts? Is that not probative? I wouldn't say that it's not probative, but it's not going to the heart of the question about accountable income, and that's moving money between the accounts, in fact, creates an illusion that there is more money than there is. But he's the one who's doing the transfer, and why couldn't the jury reasonably infer that he's trying to hide income? And on top of that, you've got his lies to the investigators during the February 2020 interview, where he's pretty much telling them that he's running a thriving business. Yes, and I think all of that can be considered by the jury, and we're not trying to say that circumstantial evidence could not be considered by the fact finder at all. I think what's important, though, is that the fact finder did not know what conclusion they were trying to reach about this entitlement, because they weren't told what income was in a way that was clear and decisive. So they didn't know what they were looking at those numbers for. They didn't know whether they were supposed to be taking expenses into account, and they didn't know what number they were supposed to be looking for in determining that entitlement. And that is part of the reason why, to bring me to the second point that's made in the briefing. You wanted an instruction on net income, but there was no evidence put on by your client of the expenses, so there was no evidence by which the jury could calculate net income. And so typically you don't give a jury instruction for nonexistent evidence. There was evidence put on throughout the government's case in chief on cross-examination, chiefly, where the price of gold was discussed, the employees that were working there were discussed, the expenses, again, they were extremely high, even just month-to-month to one supplier, that were put into evidence by the defense. So that was in evidence, but the question that the jury was supposed to answer, they didn't know to ask, and that was, what is income under the SSA regulatory standards, which is not just gross revenue. Well, to the extent that the agency, and here I'm referring to Ms. Coleman and her testimony, to the extent that the systems that they used there rely on IRS data, and based on those systems, there was a finding on the part of the agency that the SGA threshold had been exceeded, not once, but month after month after month. Again, maybe it isn't a clincher on net income, but why isn't it, again, circumstantial evidence? I mean, it's this concept of building a case brick by brick. Isn't that another brick that establishes their case? I'm glad you brought that up, because the IRS evidence was retracted. So the deque, as she called it... What do you mean, retracted? Initially, when Ms. Coleman made her administrative determination, the IRS records indicated a high level of income for Mr. Sandoval. She took that number, she averaged it over the course of months, and that was the entire basis for her determination of his self-employed income. I thought that was, she testified that that was not the entire basis. She testified that that was the entire basis at the time of the administrative determination, but that at trial, she was willing to state a new basis, and that was a reliance on Agent Palmiter's report, which included reference to bank records that I believe Agent Paler reviewed, that Agent Palmiter wrote about, and she didn't actually see. By the way, coming back to Judge McHugh's initial question, I noticed on the IRS letter to Mr. Sandoval that it did list Traditions as his employer. I think she asked you whether the evidence showed that Traditions was his employer, and that's what it says. I'm not sure if you're referring to the standard for self-employed versus employed. I'm just saying that the IRS letter says that Traditions was his employer. Oh, yes, and I think that was established by the evidence, and he was self-employed in Traditions. I don't see anything about a retraction. In fact, Ms. Coleman testified, I'm looking at her testimony right now, that the letters that came in in 2022 said those come in when someone has amended their taxes. Did he amend his tax returns? I don't recall the exact circumstances. This did not come out at trial at all, so it's not in the record. She said these happen when they amend their taxes. That happened at trial. It was uncontradicted testimony. She didn't know that. She wasn't familiar with that. But was there any rebuttal to that? She testified as someone who knows how everything works. She looks at all these data systems and the rest and said when these letters come in, it's because taxes have been amended. Well, I think that, first of all, she had not actually reviewed those tax records. She was just aware that they had changed. And again, if you look at Volume 5, I believe it's page 119, when she testifies about the fact that she relied on the DQA, it's 119 to 120, for determining that amount of self-employed income when she was reviewing this case initially. So she did use those numbers and she did rely on them, and they did change. And she acknowledged all that, and then she said that is usually when somebody amends their taxes. Well, she didn't say usually. I'm going to read it to you. These letters come when someone has amended their taxes. Okay. And I think if we can assume that the basis of the administrative determination initially is reliable because the IRS numbers are reliable, then whatever process the IRS used for creating the new numbers, for allowing those to be amended in that way, must be equally reliable. Why couldn't the jury infer that Mr. Sandoval filed a fraudulent amendment? I think that is so attenuated. Why is that? They've already cut off his benefits. He's lied to the investigators. Why wouldn't he do something like that? Why couldn't the jury reasonably infer that? I'm not saying he did. I'm just saying why couldn't the jury infer that? To assume that he must have lied?  Well, I think it's premised on an assumption that if you have some number that this administrative determination is based on and it changes, the bottom drops out from under it, then it must have been through fraud. That isn't the whole story. This didn't happen until after the benefits had ended. Then he comes back in. I understand that, counsel. I've got a question that I'd like you to answer about the amendment to the tax information. I don't think that it would satisfy the government's burden of proof beyond a reasonable doubt to assume that it is a fraudulent exercise. There wasn't even any evidence that he was responsible for the change in the IRS tax forms. That was just testimony by, again, a witness who had not been privy to that process and does not work for the IRS. So that's, I think, too attenuated as a basis for this man's conviction on 33 felony counts. Thank you, counsel. I know you're out of time, but I just have one question. You're referring to testimony from Ms. Colon on 119, and in that whole excerpt she is talking about things, as I understand it, that she was relying on. At the beginning of that excerpt, on page 110, she is talking about what she had asked Mr. Sandoval to try to see if she could reduce something, but I didn't get that information out. So after you had this conversation, you didn't revise your determination, answer correct. There was nothing provided that would allow me to even go in and make corrections, nothing other than disclaimers. As Judge McHugh was asking earlier, all of the information about his deductions, his lease payments, what he was paying to the jewelers that are making jewelry for him, what he's paying in payroll, all of that is information that is available to him, and the government, presumably, through the strong arm of the law, can subpoena or just ask the guy. And Ms. Coleman apparently testified that she had asked the guy, and he didn't come forward with any information to say, yeah, you can deduct these expenses. Why can't we reasonably infer that even if the government has the burden, you can reasonably infer that he did not have deductions that would reduce his debt to below $14,000 per year over this time period from 2017 to 20, because he didn't provide any of that information upon request from Ms. Coleman. I think that that is evidence that can be used by the jury, but it also is significant, again, to note the standard in which that is meaningful. And again, the jury was just not instructed as to what to do with that information. If there was an obligation on Mr. Sandoval as part of the administrative process to disclose his expenses, my understanding and my recollection of the testimony is that he said that he made no income, so that it was just zeroed out. And so it didn't represent, he didn't misrepresent expenses, he wasn't asked that in a specific way. It wasn't clear to me that Ms. Coleman understood that the countable income test applied to him, and so she didn't ask that like that, and he wasn't withholding information as I read the testimony, but instead just saying there was zero income. Okay, thank you. Thank you. Thank you, Counsel. Good morning, Your Honors. Counsel, may it please the Court, my name is Christopher Houghton. I'm here on behalf of the United States. I'm an AUSA in Albuquerque, the District of New Mexico. After a four-day trial during which the United States presented 13 witnesses and a mountain of circumstantial evidence, the jury unanimously convicted defendant of all 35 federal counts. Those crimes fall into two categories. The 33 theft of government property counts, one through 33, and then the two false statement counts, 34 and 35. They're different brands of false statements, but they're both false statements, 34 being the 1001 and 35 being the false statement on a Social Security Disability Form under 42 U.S.C. 408. After Mr. Sandoval was convicted, he was sentenced to 15 months in prison. That represented the low end of the guideline range and three years supervised release. He was given two financial penalties. One was a special penalty assessment for $3,500 and the other was a restitution for approximately $55,000 representing the payments during the charged period for the 33 counts. The defendant raises a whole host of issues in this appeal. The first the court was really driving at, which was the sufficiency of the evidence as to count counts one through 33, and it's the United States position that the case law supports reliance on circumstantial evidence. The United States was in a particularly difficult position akin to tax evasion cases where there isn't a full accounting of the business, and so we're relying on... Did the United States subpoena any of that information? We did, Your Honor. Yes, we subpoenaed. That's how we ended up with the bank records. We did not, I don't believe, subpoena the mother's bank records, nor did we go through the process to get the tax returns. Or the landlord? I mean, the lease payments, the traditions store to the landlord? That's correct. We did not seek that information. We could have. And you could have subpoenaed his public payroll records. Did you do that? I'm sorry. His payroll records. If he had payroll records. He had people selling. Yes, but there was some significant evidence that he was concealing his financial doings. I get Ms. Hall's testimony, but my question is, whenever Ms. Hall testified, he was paying people to sell jewelry to tradition stores, right? That's accurate, yes. Sure, they weren't doing it pro bono, so he had payroll records that you could have subpoenaed. That's true, too, Your Honor. So with your subpoena power, why is it unreasonable to say, well, we're not going to just guess that if he pulls in hundreds of dollars, you know, Ms. Hall said he pulled in $150,000, $200,000 in one year. Gross, presumably. His expenses are probably not going to bring that down to $14,000, so we're going to deprive this man of his liberty, send him to prison, because I just don't think in the jewelry business your profit margins are that thin. Why isn't it, why in the world would we adopt such a barbarian standard when the government could easily have proven what his expenses were? Judge Bacharach, I don't disagree with the Court that there were many things, and this is true of many investigations, that the government can do to prove a case. But the test isn't what could you have done in addition to what you did. The test is whether it's sufficient what you showed to the jury and whether the jury could reasonably infer. Well, the question I have sort of dovetails on that, which is how did the jury know that it couldn't just look at gross revenue to determine whether he was entitled to these funds? Were they ever told that? Yes, Judge McHugh. The testimony was developed primarily through Ms. Coleman. There was significant cross-examination about that fact, that it's for profit, right? It's not gross income. And so that idea was developed there. She acknowledged that. Were they ever instructed on that? They were never instructed that that was the test. Do we have any reason to believe that the jury understood the difference between profit and gross revenue? Other than the fact that I think most people understand that, Judge McHugh, that most people report their taxes and most people understand the difference between gross and net. And I think that's what Judge Browning leaned on when he denied that instruction. In part, he said that's a term that people understand. Well, you said profit. Can we say even now, looking back at the trial record, how much profit the business made in any given year? Very difficult to say. But the question wasn't what is the exact profit that was made. The question was, is it reasonable to infer, based on the circumstantial evidence, that whatever that profit was, whatever the net earnings were, exceeded what was a very low threshold per month? Well, in the appellant's brief, on page 9, it says that the business lost money. Is there any basis for saying that? I believe they base it on some of the evidence they developed in cross of the government's witnesses, that there are expenses. But no, there wasn't any evidence put on that these were his exact business expenses. For example, there was a supplier that we called who was supplying Mr. Sandoval with jewelry, Lonnie Schroeder. And he testified that he pretty regularly did custom jewelry projects for Mr. Sandoval. And it seemed like that was the bulk of Mr. Sandoval's work. If you look at, and this is in Volume 3 of the supplemental volumes that we provided, Exhibit 50, which is an Excel summary, you can see there that Mr. Schroeder was earning about $2,000 to $4,000 a month or so from Mr. Sandoval. And so the time period those records show from June of 2017 all the way to December of 2019 show about $40,000 in jewelry. That Sandoval was paying to Schroeder? Correct. And so how much was Schroeder, I mean, how much was Sandoval selling that jewelry for? Well, we also had some indication. His products ranged from, I think the testimony from Ms. Dow was anywhere from $500 to in the tens of thousands. So you have, maybe I'm just not understanding, but you're saying, okay, Mr. Schroeder is testifying that I charged Sandoval X number of dollars for this jewelry. And I'm trying to just think, okay, well, how is a jury going to process that to have anything to do with this case? And the only way that I can think of that that would have anything to do with the case is if then the government says, and for that jewelry that Schroeder made for Sandoval, Sandoval then turned around and sold that for $100K or $90K. And so he was making a sizable profit on Schroeder's handmade jewelry. Do we have any evidence like that? There was some evidence. So when the same jewelry that Schroeder made. When we called, I believe we called Mr. Schroeder after Ms. Dow. So Ms. Dow testified to some pieces that she herself purchased. Mr. Schroeder took a look at some of those photographs and recognized some of them as his work. And so, as I recall the testimony, there was somewhere in the $10,000 range, but I'd have to go back to that volume of the transcript. But if you pair those two pieces together, the customer with the supplier, you can see at least some indication of the profit. The other indication as to profit would be in that same Exhibit 50. If you go by categories by month of just money coming into one of his business accounts, the ranges from June of 2017 to about May of 2018 are in the range of $40,000, $28,000, this is per month, ranging all the way up to $62,000. And the smallest that we see there is about $16,000. And so what the United States tried to do was to show the jury just how well Mr. Sandoval was doing at this business. In his gross sales. Correct. And then juxtaposing that with what is a very low substantial gainful employment amount, which is about $1,200 or so per month. What was the testimony at trial about the industry average profit margin for the handmade jewelry, upscale jewelry business? I don't believe that testimony came in. There could be some of that testimony in the cross of Mr. Schroeder. So this man deliberately hangs in the balance on what a jury is going to guess. Well, if he pulled in $150,000, I don't really have any idea what the profit margin might be. Maybe it's 1%. Maybe it's 80%. But the guy pulls in $150,000 or $60,000 in a trade show and he's going all over the country. Surely he must have more than $14,000 of net. And you're saying that goes beyond the realm of speculation? That's something that is proof beyond a reasonable doubt, even if accrediting circumstantial evidence? That's right, Your Honor. We did ask the jury to make that determination. The other big indicator that he was not eligible, meaning he knew he wasn't making under that amount, is that he hid this from Social Security for years. On all the forms in the interview, he wasn't saying, I have this business. Trust me, I'm not doing very well. I just like doing it, but I'm not making any money. And in fact, once you go through the expenses, I'm under $1,200. He consistently just lied about it completely. And that's 34 and 35. But I think you could also use it, Your Honor, for 1 through 33 in that part of that jury instruction said that we needed to prove, that we didn't need to prove that he knew it wasn't the United States benefits. We needed to prove that he knew he wasn't eligible to receive it. And so part of the big indicators was that he was concealing this throughout this time period. I think we'd have a much different case. I'm sorry, Your Honor. I'm sorry. Why don't you finish your thought and then I'll... I think we'd have a much different case if all you had were the financial records and he had made attempts to reveal that to Social Security. But here you have evidence that he was concealing this. So I want to ask you a question about the jury instruction. The appellant argues that the testimony at trial reflected that even the witnesses were confused about what income is and that that would be a basis on which to help the jury understand by giving the instruction. Why isn't that a good argument? I don't think it's a bad argument, Judge Matheson, to say that there could have been an instruction that helped the jury. The instruction left off with the government is required to prove that he's not entitled to the benefits. The witness testimony explained the test about eligibility. Witness testimony? I mean, juries are instructed by the judge. Is there anywhere that this jury was told he's not entitled to these benefits if his net, not gross, income exceeded this threshold? Not in the instructions, Judge McHugh. No. So they're supposed to extrapolate that from some testimony they heard from a witness. I think in some ways the instructions are generic. The pattern instruction is even more generic than the one that was given in this case. This case actually went down into eligibility. The pattern just says prove it's government property. And then judges try to fashion what I think is a reasonable balance between defining every single term, explaining every single test, and allowing those things to be given in testimony. Here I would say, Judge McHugh, there was no dispute as to what the test was. That evidence came in unrefuted. And also in closing, the defense was able to actually read the regulations to the jury. And the United States didn't dispute it and say, no, no, no, that's not correct. You can rely on gross income. Well, we embraced that burden that it was net income. So we have this combination of some, but a dearth of evidence on expenses that could be used to calculate net income. We don't have a jury instruction on income. And I take it there was no expert financial analyst witness to help the jury understand whether there was countable income. So just in terms of the core of your argument, why is it that there was sufficient evidence? Why there was sufficient evidence or on this question about the jury instruction or sort of them together? Well, I think what I'm suggesting is this is all coalescing. Right. And Judge Matheson, I take us back to there was evidence that he was, and I see, please continue. I'm over. Okay. Thank you. There was evidence about his business practices, that he pocketed money, that he concealed money, that he didn't report money. There was evidence going years back that he'd been doing this and lying to Social Security about it. And so with the financial evidence that we did show, that corroborated what you could infer from him simply concealing is that he knew he was ineligible to receive these benefits. I guess, so we have the lies that support the other convictions. And your argument, as I'm understanding it, is that because he lied, we can infer that he wasn't entitled to the benefits and that therefore you didn't have to prove that he wasn't entitled to the benefits? In a way, Judge McHugh, but I'm not saying that far. So, and it sort of gets to the questions you were asking opposing counsel. The lies about whether he was earning any income at all corroborate that he knew he was over that threshold. And that's why he was concealing it. He knew he was working, right? And he said he wasn't working. But unless he sat down and did all the, I mean, the section of the brief from the appellants that Judge Mathison read, their position is that business was losing money when you tally all this up. So, you know, maybe he didn't even need to lie. But it seems to me that's not his lie. It doesn't seem to me to be a substitute for your requirement to prove an element of the crime. I don't think it's a substitute, Judge McHugh, but it's corroborative. And so when those two things are put together, I believe that the jury can infer from that circumstantial evidence that we met our burden. Thank you, counsel. I think you both came in at about the same, so we're going to consider the case submitted and counsel are excused.